**In re The DEPARTMENT OF ENERGY STRIPPER WELL EXEMPTION LITIGATION.**

**No. MDL 378.**

United States District Court, D. Kansas.

July 7, 1986.

See also 105 S.Ct. 2321.

Joseph W. Kennedy, Morris, Laing, Evans, Brock & Kennedy, Wichita, Kan., for plaintiff.

Patricia D. Howard, Clerk Judicial Panel on Multidistrict Litigation, Washington, D.C., for Judicial Panel.

Larry P. Ellsworth, Marcia K. Sowles, Samuel Soopper, Dept. of Energy, Washington, D.C., for D.O.E.

## OPINION AND ORDER

THEIS, District Judge.

Before the Court is a settlement agreement of historic proportions, which represents the culmination of substantial efforts on the part of the litigants involved. This monumental multidistrict litigation has spanned eight years, involved hundreds of parties, entailed voluminous pleadings and concerned a variety of factually and legally complex issues of substance and procedure. At this juncture, the task of the Court is the appropriate distribution of over one billion dollars in escrowed stripper well overcharge funds. The settlement agreement currently before the Court represents a comprehensive charter for the resolution of the immediate matter of satisfactory disbursement of the escrow held under the Court's direction, as well as two related matters: distribution of crude oil overcharge funds in other cases, and settlement of litigation concerning the Department of Energy ("DOE") Entitlements Program.

*History of the Litigation*

The history of the liability portion of the litigation was summarized in this Court's memorandum and order of September 13, 1983:

> This action is a consolidation of a number of cases brought by oil producers to enjoin the Federal Energy Administration (FEA), now the Department of Energy (DOE), from enforcing Ruling 1974–29, concerning low production oil wells, commonly called "stripper wells." The Court enjoined enforcement of the regulations in question, but ordered the oil producers to deposit into escrow the difference between the stripper well price and the controlled price of crude oil affected by the injunction. As of October

31, 1982, the escrow fund, including interest, contained over one billion dollars. The issue of the validity of the regulations and Ruling was finally settled in *In re The Department of Energy Stripper Well Exemption Litigation*, 690 F.2d 1375 (Em.App.1982), *cert. denied,* [459 U.S. 1127, 103 S.Ct. 763, 74 L.Ed.2d 978] (1983), in which the Temporary Emergency Court of Appeals (TECA) reversed this Court's decision and upheld the rulings and regulations as valid. TECA remanded this action to this court, with instructions to enter judgment for DOE, which judgment has been entered. The effect of TECA's decision is to declare the funds deposited in escrow to be overcharges recovered due to violations of the petroleum pricing regulations. The remaining task is the appropriate dispensation of the escrowed funds—in effect a monumental interpleader action with potential classes and subclasses.

*In Re the Department of Energy Stripper Well Exemption Litigation*, 578 F.Supp. 586, 589 (D.Kan.1983).

TECA's decision made it clear that the escrowed funds represented crude oil overcharges and would need to be distributed to or for the benefit of injured parties. Beginning in the months following the TECA decision and continuing until the present time, this Court has received motions for intervention from scores of private and governmental entities and groups, at every level of the crude oil production and distribution chain, who have claimed to be the parties injured by the overcharges. As a result of the Court's orders granting permissive intervention, the parties to this litigation include, in addition to the Department of Energy and the plaintiff-producers:

1. a number of refiners, that claimed injury as a result of the impact of the overcharges on the Entitlements Program, as well as, in some cases, by virtue of their direct purchases of crude oil;

2. groups of petroleum product resellers and retailers, that claimed injury as a result of having paid, but having been unable to pass on, a portion of the overcharges;

3. a number of individual customers and consumer groups (including airlines, truckers and other motor vehicle users, and utilities), that claimed the overcharge costs had been passed along to them; and

4. states and territories that claimed the funds at issue as representatives of their citizens who allegedly paid higher prices as a result of the overcharges.

On September 13, 1983, this Court granted the motion of the Department of Energy to refer the issue of who was injured by the overcharges to the Office of Hearings and Appeals ("OHA") to conduct factfinding and attempt to trace the impact of the overcharges. On December 30, 1983, the OHA published in the Federal Register a public notice concerning the factfinding referral, which notice discussed the background of the litigation and invited public comments on all aspects of the referral, including the impact of the overcharges and possible refund distribution mechanisms. 48 Fed.Reg. 57608. In response to the notice, the OHA received over one hundred comments, including many comments from entities and groups not parties to this litigation. *See* Report of the Office of Hearings and Appeals of the Department of Energy, In Re Department of Energy Stripper Well Exemption Litigation, at Appendices A and B (June 19, 1985) ("OHA Report").

On May 9, 1984, the OHA published another notice in the Federal Register, announcing that it would hold an evidentiary hearing on the feasibility of tracing the impact of the overcharges. 49 Fed.Reg. 19718. That hearing was held over a period of twenty-two days, between June and October of 1984. Sixty-four public and private entities, representing thousands of members, participated actively in the hearing. Over thirty witnesses, most of whom were nationally recognized economists, econometricians and statisticians, testified, and a record of almost 13,000 pages of

written and oral presentations was compiled.

On June 21, 1985, the DOE submitted the OHA Report, together with the DOE's Statement of Restitutionary Policy, to this Court. Based on the evidence which it had received and evaluated, the OHA concluded that it was impossible to trace directly the impact of the overcharges. OHA Report at 25. However, with respect to the Entitlements Program participants, the OHA estimated that 2.7 to 8.1 percent of the overcharges were absorbed by the refiners as a class, while an estimated 91.9 to 97.3 percent of the overcharges were borne by resellers, retailers and consumers, in the aggregate. *Id.* at 77–83. The DOE's Statement of Restitutionary Policy, which was published in the Federal Register, recommended that the funds remain in escrow while the Congress was given an opportunity, during its next session, to select appropriate means for restitution. 50 Fed.Reg. 27400 (July 2, 1985). If Congress did not enact legislation providing a specific means of distribution, the DOE Statement recommended that the escrowed money should be paid to the general fund of the United States Treasury. Further, the DOE proposed to apply this restitutionary policy to other overcharge funds in crude oil cases in which it was impossible to trace the effects of the overcharges.

On June 14, 1985, and September 20, 1985, respectively, the National Council of Farmer Cooperatives and Consumers Power Company moved to intervene in this multidistrict litigation. On October 3, 1985, the Court permitted their intervention because both parties had participated in the OHA factfinding process. The Court stated that unless potential intervenors had appeared before the OHA, intervention would be denied absent extraordinary circumstances. On January 23, 1986, a number of groups purporting to represent low-income persons who used energy for home heating during the overcharge period filed an application to intervene. The Court denied this application on February 27, 1986, on the grounds that (i) several of the groups had failed to participate in the OHA

proceedings and (ii) with respect to those groups which had participated before the OHA, the groups had not made a claim for the escrowed funds and the interests of their consumer constituents were "fully protected by the longstanding and active participation of the States and the Department of Energy" in this litigation. Dk. no. 746, p. 2. In the past several months the Court has received, but has not yet ruled on, applications for intervention from a number of additional groups which had not previously appeared before the Court and which did not participate before the OHA: the Association of American Railroads, the American Waterways Operators, Inc., the Council of American Flag-Ship Operators, the National Congress of American Indians, and Southland Royalty. These applications for intervention were filed only after settlement negotiations had been conducted for several months and had culminated in a proposed settlement agreement, the existence of which was widely publicized.

On August 8, 1985, the Court held a status conference to establish a schedule for filing comments on the OHA Report and the DOE Statement. At that hearing a number of parties indicated their opposition to the findings and conclusions contained in the OHA Report. The parties also informed the Court that efforts were underway to settle the restitutionary issues in this litigation. The Court set September 23, 1985, as the deadline for the parties to submit written comments.

On September 12, 1985, the Court was informed that the OHA had prepared a draft version of its final report. Because of disputes concerning the draft report, the Court extended the deadline for filing comments on the OHA Report. Thereafter, the Court postponed the deadline several times because of the pendency of settlement negotiations. Upon the submission of the proposed settlement agreement to the Court, further proceedings regarding the OHA factfinding and the DOE Statement were postponed and the order setting

a date for the submission of comments was vacated.

### The Settlement Agreement

The parties to the settlement agreement include the Department of Energy, the fifty States and six Territories and Possessions ("the States"), the Refiners, the Resellers, the Retailers, the Agricultural Cooperatives, the Airlines, the Surface Transporters, and the Utilities. Vigorously contested negotiations were conducted by the representatives of each of these parties from November of 1985 through May 21, 1986, when the DOE signed the settlement agreement.

The agreement addresses three distinct matters: distribution of the Court's escrow and other funds relating to the injection well issue; distribution of crude oil overcharge funds in cases unrelated to the instant action; and resolution of extensive litigation concerning the DOE Entitlements Program. The distribution of the escrow monies, monies attributable to the injection well issue but not yet deposited into the escrow (deficiency funds), and monies in unrelated cases is predicated upon the DOE's estimate that the total of all such funds will be between four and five billion dollars. That amount includes the Court's escrow, which amounts to over one billion dollars, and an additional $333 million collected and held by the DOE as a result of a prior settlement of a case involving the injection well funds previously deposited with this court. *See* 51 Fed.Reg. 56 (January 2, 1986).

The agreement authorizes, in Parts II.A and B, the distribution of escrow funds to the Refiners and the Intervenors other than the States in specified amounts, as follows:

| | |
|---|---|
| Refiners | $298,514,000 |
| Retailers | 58,460,694 |
| Resellers | 58,460,694 |
| Agricultural Cooperatives | 45,476,983 |
| Airlines | 38,987,129 |
| Surface Transporters | 10,750,000 |
| Rail and Water Transporters | 9,750,000 |
| Utilities | 5,250,000 |

The balance in the escrow, including whatever deficiency funds are collected in the future, will be divided between the United States and the States for energy-related uses for the public benefit.

The Refiners will distribute their escrow in order to effectuate a settlement of other pending litigation concerning the Entitlements Program. To achieve that end, the funds received by the Refiners will be distributed according to the Refiners Escrow Agreement. *See* Final Settlement Agreement, Exhibit A, Dk. no. 814. Of the $298,514,000 to be distributed to the Refiners, $257,238,800 will be distributed among those refiners who would have had the right to sell entitlements if the remaining entitlements notices had been issued; $19,787,600 will be distributed, based on "runs-to-stills" (volume refined), among refiners who would have had to buy entitlements; another $19,787,600 will be distributed among all refiners based on runs-to-stills; and $1.7 million will be paid to Consumers Power, a cooperative utility that operates a refinery.

Many elements of the distributions of Resellers, Retailers, Airlines and Co-ops are essentially identical and are summarized here. An Initial Distribution will be made to each of the parties' escrow accounts in the following amounts:

| | |
|---|---|
| Resellers | $44,690,371 |
| Retailers | 44,690,371 |
| Airlines | 29,793,581 |
| Co-ops | 34,751,177 |

One year from the date of this Order, provided a sufficient amount of deficiency funds have been collected, each escrow account will receive a Second Distribution, as follows:

| | |
|---|---|
| Resellers | $13,790,323 |
| Retailers | 13,790,323 |
| Airlines | 9,193,548 |
| Co-ops | 10,725,806 |

The States and the DOE will divide all residual funds currently available on the date of the Order, and subject to payment of the Second Distribution, all future funds deposited in the Court's escrow. As discussed below, the States and the DOE will also divide crude oil funds administered by

the OHA, and other crude oil overcharge funds. Initially, the DOE will advance $200 million to the States to be repaid from future crude oil funds. Furthermore, $50 million from funds in the Court's escrow which would otherwise be distributed to the DOE will be reserved to assure the payment of the first $50 million from funds administered by the OHA to the States. When the DOE disburses those funds pursuant to the agreement, the $50 million reserve will be paid to the DOE. Thus, assuming $1.433 billion in this Court's escrow and payment to all other parties, the States will receive $660 million and the DOE will receive $260 million, assuming payment of the $50 million from the OHA's funds. After repayment of the DOE advance, all further funds will be divided equally between the DOE and the States.

The fifty-six jurisdictions to receive funds include the fifty States, the District of Columbia, Puerto Rico, the Virgin Islands, the Northern Marianas, Guam and American Samoa. The funds are allocated based on consumption of petroleum products during the period of controls, as determined by the DOE. *See* Final Settlement Agreement, Exhibit H. After the disbursements are made on the Payment Date established by the agreement, and after the Second Distributions to the Resellers, Retailers, Airlines and Co-ops have been funded, there will be a distribution every ninety days or when the escrow thereafter reaches $10 million. Further payments to the States from deficiency funds will reflect an apportionment to assure repayment to the DOE of the funds advanced by the DOE to the States.

Each State has discretion to select among energy-related programs identified in the agreement or otherwise approved by an appropriate court or the OHA, that are designed to benefit consumers of petroleum products within the States (which may include motor vehicle operators, electric utility customers, home heating oil customers and other end-users of petroleum products). Before receiving the funds, the Governor of each jurisdiction must assure that they will be utilized for such programs, and

must identify the programs prior to spending the funds. Among the approved programs are the five identified by Congress in the Warner Amendment, Section 155 of the Further Continuing Appropriations Act of 1983, Pub.L. No. 97–377, and the programs identified in Exhibit J to the Agreement. Each State must provide public notice and a public hearing prior to selecting the programs for which it will spend the funds. The States may use a portion of the funds received, up to the amount permitted by legislation or up to five percent, for program administrative expenses, attorney fees and other litigation costs.

The DOE will receive the funds discussed above and will obtain repayment of the amount advanced to the States, identified above, from deficiency funds and from the OHA funds. Funds received by the DOE will be deposited in the United States Treasury or will be held in reserve to meet the DOE's obligation to fund entitlements exception relief.

Under the settlement agreement, the DOE will modify its June 21, 1985, Statement of Restitutionary Policy governing crude oil funds by providing an opportunity in special refund proceedings pursuant to 10 C.F.R. Subpart V for nonsettling waiving claimants to submit any claims of injury from an alleged crude oil violation, and by dividing between the federal government and the States all funds not distributed to successful claimants. Funds received by the States under such proceedings will be allocated and used for the same purposes and in the same manner as funds received from the Court's escrow. The requirements for letters of assurance from the Governors, public hearings, identification of programs prior to expenditures, limitations on programs and reporting requirements are identical to those which apply to funds from the Court's escrow. Funds received by the DOE as a result of this policy will be subject to the same limitations on uses as described above, i.e., for deposit in the Treasury or to fund entitlements exception relief. The DOE will rec-

ommend that all judicial cases involving crude oil be resolved similarly.

All parties and claimants receiving funds under the agreement will waive any further claims to crude oil refunds. In light of the waivers which have already been signed and the tens of thousands of additional waivers which are expected to be signed, few claims by non-waiving individuals asserting injury are likely to be filed at the OHA in other crude oil cases. As a result, the policy to be adopted by the DOE will be to establish an initial reserve for such claims amounting to twenty percent of the funds received by the DOE and to disburse the remaining eighty percent in advance of the implementation of a claims procedure. The reserve in the OHA will assure the availability of adequate funds for successful claimants. The DOE will issue the modified policy statement twenty days from the date of the Court's Order, and will distribute the available OHA crude oil funds, amounting to at least $100 million, ten working days later.

The question of the deficiency funds to be paid to the Court's escrow is not resolved by this agreement. As to most of the firms involved, discovery has not been completed. These matters must be resolved on a company by company basis. While the agreement does not resolve any of the deficiency issues, it calls for cooperation among the parties to the agreement to expedite resolution of discovery issues, for the payment of uncontested amounts of deficiencies, for the waiver of penalties and for dismissal of any producer party when its deficiency has been satisfied.

There are two cases before the Court which are not part of M.D.L. No. 378: *Kerr-McGee Corp. v. Gulf Oil Corp.*, Civil Action No. 84–1061, and *Total Petroleum Corp. v. Muskegon Oil Co.*, Civil Action No. 85–1968. Gulf and Muskegon have paid funds into the Court's escrow. The agreement establishes reserves within the escrow in the amounts of $30 million for *Kerr-McGee* and $10 million for *Total*, in the event the Court determines that any judgment should be satisfied from such

funds. *See* Final Settlement Agreement, ¶ II.C.2. However, the parties to the agreement retain the right to challenge the position that judgments in these cases may be paid from the Court's escrow.

*Comments Regarding the Settlement Agreement*

The parties to M.D.L. No. 378 (with one exception) and to the settlement filed a joint memorandum in support of the settlement agreement. Several other interested parties, such as Shell Oil Company and the American Trucking Association, Inc., also filed individual supporting memoranda. Only one party to M.D.L. No. 378 which made a claim before the DOE for the escrowed funds did not sign the agreement. That party, Total Petroleum, initially filed an objection to the agreement. Total's concerns have been resolved by the parties and Total has withdrawn its objection. The Association of American Railroads, the American Waterways Operators, Inc., and the Council of American Flag Ship Operators (previously listed generically as "Rail and Water Transporters") originally filed objections to the proposed settlement, which objections were later withdrawn.

The Georgia Poverty Rights Organization ("GPRO") and the National Congress of American Indians ("NCAI") both submitted letters to the Court which reflected their particular concerns. The GPRO requested that the settlement agreement mandate that each State expend a proportionate share of its funds on identifiable low-income programs, depending on the percentage of low-income households in the State. The NCAI requested a similar apportionment for tribal programs, based on the percentage of Native Americans within each State. As a result of negotiations, the signatories to the agreement and NCAI agreed that NCAI would withdraw its motion to intervene in exchange for the States conferring on the tribal governments and their citizens an appropriate equitable share of the benefits from State energy-related restitutionary programs either as a part of the programs benefitting the general population or otherwise. Dk. no. 846.

The GPRO has agreed to dismiss its appeal in exchange for similar considerations. Dk. no. 843. In both cases, the concerns expressed by these groups were directed solely at the conditions governing the States' uses of the funds under the agreement; and in both cases, stipulations as to language and criteria resolved the incipient obstacles.

Muskegon Development filed comments supporting the settlement, but asked that an additional amount of $573,132.48, plus interest since February 28, 1986, be added to the set-aside for *Total Petroleum Corp. v. Muskegon Development Co.*, Civil Action No. 85–1968–T, since the $10 million called for in the agreement is no longer adequate to cover fully the claims made in that case. The parties to the agreement have indicated that they have no objections to this addition.

Southland Royalty Company filed an opposition to the agreement, alleging that the settlement would adversely affect Southland's claim that Gulf Oil Corporation erroneously deposited in the Court's escrow monies owed to Southland. Specifically, Southland claims that Gulf deposited funds into the escrow which properly qualified for uncontrolled prices under the DOE's tertiary incentive regulations, a petroleum production matter which was not before this Court in M.D.L. No. 378. DOE has opposed any withdrawal of escrowed funds deposited by Gulf because the DOE asserts that Gulf has not paid all that it owes. If Southland can substantiate its claims, the DOE has no objection to paying Southland once all of Gulf's deficiencies are satisfied. The parties to the agreement have proposed to establish a set-aside of $6 million. Southland has accepted this offer.

Congressman John Dingell, Chairman of the Subcommittee on Oversight and Investigations of the House Committee on Energy and Commerce, wrote a letter to the Court delineating certain objections to the settlement agreement. Later in this opinion the Court will address in detail Congressman Dingell's concerns.

Finally, on June 12, 1986, this Court held an open hearing on the settlement agreement. Over seventy attorneys attended the proceedings. At this hearing, parties in favor of and opposed to the settlement agreement were given the opportunity to comment on the agreement. A number of parties spoke in favor of the agreement. Because of its concerns regarding the set-aside, Southland spoke in opposition to the agreement.

*Court Approval of the Settlement Agreement*

In its review of the settlement agreement, the Court is guided by a number of principles. As a matter of public policy, the law favors and encourages settlements. *Bass v. Phoenix Seadrill/78, Ltd.*, 749 F.2d 1154 (5th Cir.1985); *Amoco Production Co. v. Federal Power Commission*, 465 F.2d 1350 (10th Cir.1972). The settlement of actions should be fostered to avoid protracted, wasteful and expensive litigation. *Pfizer, Inc. v. Lord*, 456 F.2d 532 (8th Cir.), *cert. denied*, 406 U.S. 976, 92 S.Ct. 2411, 32 L.Ed.2d 676 (1972). Particularly in complex cases the litigants should be encouraged to determine their respective rights between themselves. *See Manual for Complex Litigation, Second*, § 23.11 (1985). It is in the interests of the courts and the parties that there should be an end to litigation, and the law favors the peaceful settlement of controversies.

Before the Court can approve a proposed settlement, it must find that the agreement is fair, adequate and reasonable, and is not the product of fraud by or collusion among the negotiating parties. *Ficalora v. Lockheed California Co.*, 751 F.2d 995 (9th Cir.1985). In the context of government enforcement consent decrees, courts have held that "[u]nless a consent decree is unfair, inadequate or unreasonable, it ought to be approved." *SEC v. Randolph*, 736 F.2d 525, 529 (9th Cir.1984). The approval of a settlement agreement does not depend on an exact determination of the merits of the dispute. There is no talismanic formula for ascertaining when a settlement is reasonable. Rather, "[t]he

evaluation of a proposed settlement requires an amalgam of delicate balancing, gross approximations and rough justice." *City of Detroit v. Grinnell*, 495 F.2d 448, 468 (2nd Cir.1974).

A determination of whether a settlement is fair, adequate and reasonable requires an analysis of the risks and potential rewards of continued litigation compared to the actual benefits achieved by the proposed termination. The factors a court must consider include the complexity, expense and likely duration of the litigation, the stage of the proceedings and the amount of discovery completed, the opinions of the negotiating parties' counsel, the arms-length nature of the negotiations and the reaction of parties opposing the settlement. *See Reed v. General Motors Corp.*, 703 F.2d 170 (5th Cir.1983); *Walsh v. Great Atlantic & Pacific Tea Co., Inc.*, 96 F.R.D. 632 (D.N.J.1983); *Susquehanna Corp. v. Korholz*, 84 F.R.D. 316 (D.Ill. 1979).

An assessment of these factors convinces the Court that the settlement agreement, taken as a whole, is fair, reasonable and adequate to all concerned parties. The agreement was reached after arms-length negotiations among a wide range of groups representing competing interests. The negotiations were extensive and hard-fought. The very fact that objections to the agreement were lodged in the record and later withdrawn attests to the process of compromise. Counsel entered into the negotiations well-versed in the merits of their clients' claims. Although the Court has independently evaluated the proposed settlement, the professional judgment of counsel involved in the litigation—who have made a determination that the settlement represents a fair allotment for their clients—is entitled to significant weight. *Johnson v. Montgomery County Sheriff's Dept.*, 604 F.Supp. 1346 (D.Ala.1985); *In re Baldwin-United Corp.*, 105 F.R.D. 475 (S.D.N.Y.1984).

Moreover, that a government agency, which is committed to the protection of the public interest, has participated in the compromise negotiations and endorsed their results is a factor in favor of settlement approval. *Marshall v. Holiday Magic, Inc.*, 550 F.2d 1173 (9th Cir.1977); *Jones v. Amalgamated Warbasse Houses, Inc.*, 97 F.R.D. 355 (E.D.N.Y.1983). The Department of Energy has participated extensively throughout the liability, damages and settlement phases of this complex and protracted litigation. Furthermore, pursuant to government procedures, the settlement agreement was scrutinized and approved by both the Department of Justice and the Office of Management and Budget ("OMB").

Finally, the near-unanimous support for the settlement agreement is a factor favoring approval by the Court. While a settlement stands or falls on its merits and not on a head count between its proponents and objectors, the overwhelming support for the settlement carries some persuasive force. The joint motion in support of the settlement agreement is signed by representatives of the DOE, the fifty-six States and Territories, over ninety-eight percent of the participants to the DOE entitlements program, the refiners, resellers, retailers, airlines, agricultural cooperatives, surface transporters and utilities. Equitably also the other major nonparties or intervenors who were primary industrial users of petroleum products during the price-control period, viz., the railroads, steamship lines and barge lines, have been included in the distribution contemplated by the settlement and have withdrawn their objections and joined the settlement. There is no opposition to the settlement agreement by any party to the litigation.

The agreement provides substantial benefits for all parties and for the public, and it represents a fair compromise of the parties' competing positions. The agreement provides a significant amount and major portion of the funds to the States and to the federal government on behalf of the consuming public. The Temporary Emergency Court of Appeals has approved the form of relief in which restitutionary funds are channeled through the States for use in

enumerated energy programs designed to benefit the public. *United States v. Exxon Corp.*, 773 F.2d 1240 (TECA 1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 892, 88 L.Ed.2d 926 (1986). By according the States latitude in selecting the programs that will best meet the needs of their particular citizens, the agreement allows the States to benefit various categories of petroleum consumers who may not receive direct refunds under the agreement. In addition, the agreement provides for payments to the United States Treasury, which will "fulfill the restitutionary goal of requiring plaintiffs to disgorge their judicially-determined illegal gains." *In re Department of Energy Stripper Well Exemption Litigation,* 578 F.Supp. at 595. At the same time, the agreement reserves to the DOE the prosecutorial discretion necessary for it to complete pending and future enforcement actions arising from the era of petroleum price controls.

The ratio of apportionments to the refining industry under the settlement agreement falls within the range of overcharge estimates established in the OHA Report. Assuming that the total amount of crude oil overcharges will be between four and five billion dollars, the $298 million to be divided among the Entitlements Program participants is between 6 and 7.5 percent of the total, which is within the 2.7 to 8.1 percent range of overcharges the OHA determined that the refiners absorbed as a group. In exchange for this apportionment, a number of refiners have compromised other claims they asserted to the fund as first purchasers. Similarly, the distribution through a claims procedure of $215 million to petroleum resellers and retailers, agricultural cooperatives, airlines, surface transporters and utilities, will fairly and adequately compensate the members of these groups. While these groups originally requested a much larger percentage share of the escrowed funds, the Court agrees with the parties' own assessments that the settlement is in their best interests.

The risks of continued litigation are substantial for all of the parties. If the reme-dy issues were not resolved by agreement, each of the parties would face the risk of a significantly reduced recovery or no recovery at all. Since the OHA Report concluded that the refiners as a class were injured and that the remainder of the overcharges were passed on to resellers and consumers, the recoveries obtained by the DOE and the States under the agreement would not have been assured otherwise. Likewise, the private parties to the litigation faced the risk that the Court would direct all of the funds to the United States Treasury and the States. Thus, the benefits accruing to parties under the agreement outweigh the risks of continued litigation.

In addition, the agreement protects the interests of non-parties and of parties to other pending litigation. Insofar as the agreement provides set-asides to satisfy final judgments in private overcharge actions, it secures the rights of parties to that litigation. The agreement also allows the OHA to reserve amounts to satisfy claims of injury from overcharges by non-parties. Furthermore, the settlement will immediately free funds held by the OHA for the benefit of injured consumers.

The agreement will permit the resolution of (i) claims to other crude oil overcharge funds which have been or will be recovered by the DOE in a great many administrative or judicial proceedings; and (ii) the litigation between the DOE and numerous refiners over the termination of the Entitlements Program, which has been pending in some cases for more than five years. Thus, after payment of the specified amounts referred to above, the agreement provides for an equal division between the DOE and the States of crude oil overcharge refunds to be recovered in all other administrative and judicial proceedings, regardless of whether such funds are currently in escrow or whether such cases have commenced on the date of this Order. Furthermore, the agreement will release most private crude oil overcharge claims among and against the parties, thereby avoiding additional litigation.

Muskegon has requested a modification of the agreement. The parties anticipated that the $10 million set-aside created in paragraph II.C.2. of the agreement would be sufficient to satisfy any judgment obtained by Total in its action against Muskegon. The parties have stated that they would have no objection to the set-aside being increased by $573,132.48, plus interest from February 28, 1986, to reflect the full amount of escrowed funds attributable to Muskegon's sales to Total as of February 28, 1986. The Court finds that this adjustment is appropriate and in accord with the agreement.

Similarly, the set-aside proposed for Southland fully satisfies any claim Southland might have against the escrowed funds. The parties were able to arrive at an agreement with respect to terms and conditions. However, the Court notes that much of the dispute between the DOE and Southland involved concerns not germane to the litigation surrounding the escrowed funds. The Court finds that the interests of Southland are adequately provided for by the set-aside.

The public interest will be advanced by the value of an immediate recovery, which will avoid the delay and expense of further litigation. This litigation has been pending since 1978. Numerous issues would remain to be resolved by this Court in the absence of a settlement agreement. In addition, the agreement's release of most private crude oil overcharge claims among the parties will avoid additional litigation. By conserving the very substantial amount of time and resources which the courts, the DOE, the States and numerous private parties would otherwise be required to expend in these proceedings, the agreement promotes the public interest in a very broad sense.

The only extant opposition to the fundamental mechanics of the settlement agreement comes to the Court in the form of a letter from Congressman John Dingell, Chairman of the Subcommittee on Oversight and Investigations of the House Committee on Energy and Commerce, which letter the Court has ordered to be made a part of the court file in this case. Because the Subcommittee on Oversight and Investigations represents the public interest, and both in the past and in the present has and is performing a very praiseworthy function in oversight of federal governmental policies and actions, the Court believes it is important to address the concerns raised by Congressman Dingell.

First, Congressman Dingell contends that the settlement agreement has not been subject to public scrutiny. Initially, there is some confusion with respect to what the DOE regulations require in the form of public comment. See 10 C.F.R. § 205.199J. However, the Court need not pass upon whether the DOE regulations apply to court-approved settlement agreements or only to consent orders and administrative documents for two significant reasons. If the DOE regulations have not been adhered to, that is an internal matter for the DOE and Congress to resolve in a forum other than the present one. More importantly, though, the Court believes the final settlement agreement has undergone adequate public scrutiny.

The most interested parties have either signed the settlement agreement or have expressed their concerns to the Court. The Court has received numerous letters regarding the settlement, from groups such as the Associated Catholic Charities of Baltimore, the Georgia Poverty Rights Organization, Project Independence, and the Public Utility Law Project of New York, Inc., to name but a few. Furthermore, groups and entities specifically designated to represent the public interest—such as the Department of Energy and the fifty States' attorneys general—have participated extensively in these proceedings and have subjected the settlement agreement to the closest scrutiny. Additionally, it is a prime function of the Court in reviewing the settlement agreement to determine whether the settlement adequately protects the public interest. See *United States v. Hooker Chemical & Plastics Corp.*, 607 F.Supp. 1052, 1057 (W.D.N.Y.1985). To

that end, on June 12, 1986, the Court conducted a publicly visible settlement conference, which was attended by over seventy attorneys and numerous representatives of the press. As the history of the Court's referral of the overcharge issues to the OHA demonstrates, there has been public participation at every step of these proceedings. In addition, the settlement agreement itself requires a public hearing process in advance of any State's distribution of funds. *See* Final Settlement Agreement at II.B.3.f.i.

Finally, public scrutiny is but a means to the end of insuring that public interests are protected. The Court is convinced that the proposed settlement agreement will inure to the public good. The Court delineated many of the benefits of the settlement above. Any lingering doubts regarding the protection of the public are dispelled by the provisions of the settlement agreement itself. The programs to which the States may target their funds are specifically detailed in the agreement. Final Settlement Agreement at II.B.3.f.ii. The funding for state programs may only be used to supplement, not to supplant, other funds directed at those state programs. Such funding would require decisional authority of the highest state executive officials, i.e., the Governor and Attorney General, with latitude for state legislative input. *Id.* at II.B.3.f. Finally, the settlement agreement provides for both DOE and Court oversight of State expenditures. The settlement agreement, which affords significant public benefits, has been and will continue to be subjected to the most searching public scrutiny.

Second, Congressman Dingell suggests that the settlement agreement is inconsistent with House Concurrent Resolution 337, which required that reconciliation legislation concerning oil overcharge matters be enacted by the 99th Congress. The Court appreciates being apprised of legislative actions. However, a House Resolution is not tantamount to legislation passed by both chambers and signed by the President of the United States.

A House Committee Report regarding the Resolution assumed this Court would take no action on the proposed settlement agreement so that Congress could act in its stead. In light of the separation of powers, and with utmost respect for Congress as a primary source of "the supreme law of the Land" under Article VI, the Court declines to remain dormant. One purpose of the separation of powers is to prevent an unnecessary and dangerous concentration of power in one branch. *Chadha v. Immigration and Naturalization Service,* 634 F.2d 408, 422 (9th Cir.1980), *aff'd,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1982). The separation of powers was not instituted with the idea that it would promote governmental efficiency, but was looked to instead as a bulwark against tyranny. *United States v. Brown,* 381 U.S. 437, 443, 85 S.Ct. 1707, 1712, 14 L.Ed.2d 484 (1965); Federalists 48, 51 and 71.

Inaction on the part of this Court would be an abdication of its constitutional responsibilities. Conversely, any action taken by this Court would resolve a matter particularly within the province of the judiciary: eight years of multidistrict litigation. Furthermore, action on the part of this Court will not impede or impair the legislature from performing its constitutionally assigned function. Congress possesses full authority to pass any legislation it deems wise and proper. But the task of adjudication of matters which are ripe for decision must be left to Article III tribunals, of which this Court is one, acting additionally with multidistrict authority under Congressional legislation with appellate court review.

Third, Congressman Dingell complains that the settlement agreement improperly links the stripper well cases with litigation pending in another court concerning entitlements. The negotiated settlement gives the refiners a percentage of the overcharges within the range of the estimates contained in the OHA Report. Since the OHA Report could not trace specific overcharges, if the refiners choose to distribute their allotment along the lines of standards

set in the entitlements litigation, that is entirely permissible. Furthermore, there is no improper linkage of petroleum cases. That the settlement paints with a broad brush does not persuade the Court that the agreement is unreasonable. On the contrary, compromise is the essence of settlement, and parties may settle more than one case at a time. *Nelson v. Waring*, 602 F.Supp. 410 (D.Miss.1983).

Fourth, Congressman Dingell contends that the settlement agreement would moot the proposed restitutionary policy that the DOE submitted to this Court. It should be noted the referral of this matter to the DOE was limited to factfinding regarding tracing of the payment of the overcharges for the ultimate purpose of assisting the Court in the exercise of its restitutionary jurisdictional power. The DOE's policy proposal was not binding on the Court or cloven in stone for Congress. The Court does not agree with Congressman Dingell's view that changes in position are inherently mischievous:

> Although perhaps irritating to a court and grounds for skepticism, such changes are not impermissible. As noted in *Montana Power Co. v. EPA*, 608 F.2d 334, 349 (9th Cir.1979), "it does not matter that [a party] 'switched horses in midstream' as long as it 'was astraddle a good horse when it reached the other side.'" *See also Public Service Comm'n v. FPC*, 511 F.2d 338, 353 (D.C. Cir.1975) (agency may "switch rather than fight the lessons of experience").

*Texaco, Inc. v. Department of Energy*, 795 F.2d 1021, 1024 n. 6 (TECA 1986). In the instant case, the DOE policy, as modified by the settlement agreement, provides a claims procedure and protects the rights of non-parties who have not participated in the court process—changes which the Court perceives are for the better.

Fifth, according to Congressman Dingell, a number of the agreement's terms are contrary to an opinion of the General Accounting Office ("GAO"). However, many of the GAO's complaints concern the settlement of the entitlements litigation in tandem with the stripper well litigation, an issue the Court previously addressed. In Congressman Dingell's statement in opposition to the motion to approve the settlement agreement, he states that "[a]pproval of the Settlement Agreement would put this Court in the position of appearing, at least, to overrule the GAO without ever hearing from that agency." Dk. no. 836, p. 13. As the Court explained above, the principle of separation of powers prohibits judicial subservience to the various sentiments of coordinate branches. Furthermore, this Court is without jurisdiction to pass upon the policy statements of the GAO. With respect to the substance of Congressman Dingell's contention, the Court chooses to rely on the expertise of the DOE—which has participated in these multidistrict proceedings since their inception—in determining when it should compromise its stances in various cases to bring about a salutary resolution of the greatest amount of litigation. The DOE decision is buttressed by approval of the Justice Department and the OMB.

Finally, Congressman Dingell questions the administrative and attorneys fees that will come from the oil overcharge money under the terms of the settlement agreement. While the simultaneous negotiation and deduction of fees from a settlement fund is not to be encouraged, it is not improper. *Piambino v. Bailey*, 757 F.2d 1112 (11th Cir.1985); *Mendoza v. Tucson School District No. 1*, 623 F.2d 1338 (9th Cir.1980), *cert. denied, sub nom Sanches v. Tucson Unified School District No. 1*, 450 U.S. 912, 101 S.Ct. 1351, 67 L.Ed.2d 336 (1981); *In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions*, 410 F.Supp. 706 (D.Minn.1975). Because of the arms-length nature of the bargaining and the presence in the negotiations of participants designated to represent the public interest, the Court is persuaded that the allocation of administrative and attorneys fees involved no improper arrangements or sweetheart deals. The administration of the proposed settlement will entail a great deal of management and accounting expenses. Furthermore, a number of safeguards contained in the agree-

ment will prevent any possible excesses. The amounts of administrative expenditures the States are permitted to make are subject to legislative and regulatory caps or to a limit of five percent of the funds allocated to the States. Final Settlement Agreement at II.B.3.f.iii. Thus, the States' fee requests are reasonable in terms of the percentage they represent of the total overcharge. *See Blum v. Stetson*, 465 U.S. 886, 104 S.Ct. 1541, 1549–50, n. 16, 79 L.Ed.2d 891 (1984). The attorneys general must file with the disbursing officials written notices of the amount and manner of direct disbursements for payment or reimbursement of litigation expenses. *Id.* Prior to the expenditure of any funds or payments permissible under the agreement, the States must submit reports to this Court and to the Secretary of Energy identifying the programs or payments for which such funds will be expended. *Id.* at II.B.3.f.iv. Thus, the Court interprets this provision as authorizing Court oversight of the expenditures for administrative and attorneys fees. With respect to the surface transporters and the utilities, the disbursement of attorneys fees is specifically made subject to Court approval. *Id.* at Exhibits F and G. In light of the built-in checks on the propriety of expenditures, the Court finds that the allotments for administrative and attorneys fees are proper.

In conclusion, the Court finds that the benefits of the settlement agreement far outweigh the burdens that continued litigation would entail. The terms of the agreement equitably provide for the concerns of the parties and the public. The agreement contains within it adequate mechanisms for insuring the just distribution of funds, including oversight authority and the obligation to make public reports—and this is subject to the Court's continuing equity power to insure compliance. The Court concludes that the proposed settlement of this difficult and intricate multidistrict litigation is fair, adequate and reasonable.

IT IS THEREFORE ORDERED that the final settlement agreement, with the modifications noted herein, shall be approved. The Court shall execute separately the necessary orders of disbursement.