**CONSOLIDATED EDISON COMPANY OF NEW YORK, et al., Plaintiffs,**

v.

**Spencer ABRAHAM, Secretary of Energy, et al., Defendants.**

**No. CIV.A.1:01CV00548(RMC).**

United States District Court, District of Columbia.

May 9, 2003.

Philip Poliner Kalodner, Gladwayne, PA, for Plaintiffs.

Thomas Halsey Kemp, U.S. Department of Energy, Washington, DC, for Defendants.

## MEMORANDUM OPINION

COLLYER, District Judge.

Plaintiffs, who are utilities and manufacturers in the energy industry, have filed suit to require the United States Department of Energy and two senior department officials (collectively, "DOE") to complete the distribution of crude oil overcharge refunds to more than 56,000 end users of oil products found by the DOE to be entitled to such restitution.[1] They complain that (1) the DOE's Office of Hearings and Appeals ("OHA") has improperly limited refunds for private-party claimants to no more than 20% of the recovered overcharges designated for restitution (with 80% going to the States and the federal government), (2) the DOE has a duty to complete the distribution of overcharge refunds to private parties, even if only the 20% set-aside, and (3) proceeds from a legal settlement in 1984 between the United States and Marc Rich & Co. A.G. and Marc Rich & Co. International (collectively, "Marc Rich Companies") should be included in the 20% reserve funds.

Pending before the Court are the DOE's motion to dismiss or, in the alternative, for summary judgment and Plaintiffs' motion for partial summary judgment. The DOE seeks to dispose of the entire case, while Plaintiffs request summary judgment only on the second count of their complaint.[2] For the following reasons, the Court grants in part and denies in part both the DOE's motion for summary judgment and Plaintiffs' motion for partial summary judgment.

## I. BACKGROUND

### A. Brief History of the Crude Oil Refund Process

Thirty years ago, the Organization of Petroleum Exporting Countries ("OPEC") imposed an oil embargo on the United States, causing the price of crude oil in this country to rise dramatically. Congress responded to this economic crisis by passing the Emergency Petroleum Allocation Act of 1973 ("EPAA"), 15 U.S.C. § 751 et seq.[3] Under that statute, the DOE and its predecessor, the Federal Energy Administration, issued price control orders governing the sale and resale of crude and refined oil. The EPAA empowered the DOE to recover overcharge amounts from violators of the price controls, which remained in effect until Janu-

---

1. Plaintiffs are ten of the claimants who would receive almost 15% of the crude oil overcharge refunds under the formula applied by the DOE. Filing a motion to certify a class has been postponed until the legal issues addressed here are resolved.

2. Plaintiffs desire to defer action on Counts One and Three until after discovery.

3. The EPAA incorporated the following portions of the Economic Stabilization Act of 1970 ("ESA"), 12 U.S.C. § 1904 note. Section 209 of the ESA authorized the DOE to obtain restitution for overcharges in violation of the price controls. See id. Section 210

provided a private cause of action for persons to recover money damages (including treble damages) from price gougers. See id. Section 211 provided, in relevant part, that federal district courts have exclusive original jurisdiction over any cases and extended exclusive appellate jurisdiction to the Temporary Emergency Court of Appeals ("TECA"). See id. Pursuant to these provisions, the DOE collected overcharges from producers and suppliers of crude oil through administrative enforcement actions, court judgments, and settlements, with most of the recovered monies going directly to the States and the federal government.

ary 1981.[4] The DOE's authority to seek restitution of illegal overcharges was subsequently repealed, barring actions commenced after September 30, 1988, or six years after an alleged price control violation, whichever was later. *See* 15 U.S.C. § 4504(a)(1). Through this process, the DOE has collected billions of dollars.

In 1986, within the context of a settlement of multi-district litigation in *In re Dep't of Energy Stripper Well Exemption Litig. ("Stripper Well")*, 653 F.Supp. 108 (D.Kan.1986), the DOE agreed to a restitutionary policy for cases involving crude oil overcharges that would allow private parties to recoup losses. The parties in the *Stripper Well* litigation accepted certain funds that had been placed in escrow and waived all existing and future claims to refunds. *See id.* at 114. For non-parties—such as Plaintiffs in this case—the DOE set up a process for victims of overcharges to submit claims for refunds. To pay such claims, the agreement authorized the OHA to reserve in escrow 20% of all crude oil overcharges recovered from current and future collections by the DOE. *See* Settlement Agreement IV.B.6, *reprinted in* 7 Energy Mgmt. (CCH) ¶ 90,509. The remaining 80% would be split equally between the States and the federal government.

In conjunction with the *Stripper Well* litigation settlement agreement, the DOE adopted a Modified Statement of Restitutionary Policy for Crude Oil Cases ("MSRP"), 51 Fed.Reg. 27,899 (Aug. 4, 1986). The OHA solicited comments concerning the appropriate procedures to be employed, *see* 51 Fed.Reg. 29,689 (Aug. 20,

1986), and subsequently issued a Notice Explaining Procedures for Processing Refund Applications in Crude Oil Refund Proceedings under 10 C.F.R. Part 205, Subpart V ("Notice"), 52 Fed.Reg. 11,737 (Apr. 10, 1987). The Notice outlined the application process, the nature of proof required to show overcharges, the methodology for the calculation of refunds,[5] and the OHA's intention to reserve 20% of the funds for private-party claimants. *See id.* at 11,737–11,744. The OHA stated, "The remaining 80 percent, and any unclaimed funds, will be divided between the State and Federal governments as representatives of the energy-consuming public." *Id.* at 11,739. It added, "Under the MSRP, up to 20 percent of the alleged crude oil violation amount may be reserved for the payment of claims to injured persons. For the present time, OHA has decided to reserve the entire 20 percent to ensure that adequate funds will be available for refunds." *Id.* at 11,744. Furthermore, the OHA announced that it would follow a policy of "full parity," whereby those who received refunds after the *Stripper Well* litigation would be compensated on the same basis as participants in that settlement. Monies for the States and the federal government have been disbursed as they were collected; other monies have been distributed as claimants have made claims.

The OHA has now processed over 100,000 claims and—based on the parties' representations at a motions hearing held on April 29, 2003—has 12 initial applications and 13 applications for supplemental re-

---

**4.** The price controls were ended by Executive Order No. 12287, 46 Fed.Reg. 9909 (1981).

**5.** Subpart V utilizes a "volumetric method" for determining an individual claimant's refund. Under this formula, a distribution is made "by dividing the crude oil overcharge moneys (the 'numerator') by the total volume

of U.S. consumption of petroleum products during the period of price controls (the 'denominator'). This resulting fraction is then multiplied by the individual's volumetric consumption to produce the resulting refund." *Consolidated Edison Co. v. O'Leary ("Con Ed II")*, 117 F.3d 538, 541 (Fed.Cir.1997).

funds remaining.[6] The 20% funds are no longer receiving new money, as the program's enforcement ended years ago. As of August 21, 2001, Plaintiffs state that the reserve for restitution to private parties held approximately $262.2 million in four "Crude Tracking–Claimants" accounts and a "Citronelle–End Users" account. Plaintiffs have received approximately $90 million in total by availing themselves of the Notice procedures. In all, as of August 21, 2001, the DOE has apparently distributed more than $610 million to individual end-user claimants.

### B. Passage of the PODRA

The Petroleum Overcharge Distribution and Restitution Act of 1986 ("PODRA"), 15 U.S.C. §§ 4501–4507, expressed congressional preference for individual restitution rather than distribution solely to governmental entities. "The PODRA requires the DOE to reserve sufficient funds to make restitution to those who suffered the actual losses, 15 U.S.C. § 4502(c)(1), and to pay the excess to federal and state treasuries 'as indirect restitution[.]'" *Texas Am. Oil Corp. v. Dep't of Energy*, 44 F.3d 1557, 1568 (Fed.Cir.1995) (*en banc*). The PODRA directs that "the Secretary [of Energy] shall give primary consideration to assuring that at all times sufficient funds (including a reasonable reserve) are set aside for making such restitution" with the "excess" to be disbursed to government agencies at the State and federal levels. 15 U.S.C. § 4502(c)(1). This principle applies to crude oil refunds as well as refined product refunds. *See Texas Am. Oil Corp.*, 44 F.3d at 1568; *see also Getty Oil Co. v. Dep't of Energy*, 117 F.R.D. 540, 546 (D.Del.1987), *aff'd*, 865 F.2d 270 (TECA 1988) (The "PODRA and its legislative history demonstrate that an acceptable distribution plan for a crude oil over-charge fund must include a mechanism for direct restitution to injured private persons.").

In 1998, Congress repealed those sections of the PODRA that established a procedure for the DOE to reserve a portion of the refined product refunds that was estimated necessary for individual restitution. *See* 15 U.S.C. § 4502. It specifically provided, however, that the "Secretary [of Energy] shall assure that the amount remaining in escrow to satisfy refined petroleum product claims for direct restitution is allocated equitably among the claimants." 15 U.S.C. § 4502(e). While this action is not directly relevant to this lawsuit for crude oil refunds, Plaintiffs argue that its statement of principle must be applied to their claim for total restitution.

### C. Settlement with the Marc Rich Companies

In October 1984, the Marc Rich Companies settled with the United States Attorney for the Southern District of New York certain claims for crude oil overcharges and the failure to pay taxes on the illegal profits gained from these overcharges. Under the terms of the settlement, the Marc Rich Companies paid $150 million to the United States. Plaintiffs assert that the DOE had a statutory obligation under the ESA to deposit $20–26 million from the settlement into the 20% reserve funds for private-party claimants.

## II. ANALYSIS

On August 1, 2001, the DOE filed a Motion to Dismiss or in the Alternative for Summary Judgment ("DOE Motion"). Plaintiffs have responded with a Motion for Partial Summary Judgment and a Statement of Points and Authorities in Op-

---

**6.** The parties also stated at the hearing that there are approximately 20,000 small claims pending, each for less than $50.

position to Defendants' Motion to Dismiss or in the Alternative for Summary Judgment and in Support of Plaintiffs' Motion for Partial Summary Judgment ("Plaintiffs' Opposition"). Each party has submitted a Reply. Despite the alternative presentation of the DOE's motion, since both parties rely on documents outside the pleadings, the Court treats their filings as cross motions for summary judgment, one for full judgment and one for partial judgment.

## A. Standard of Review

Summary judgment is appropriate when the record shows that no genuine issue exists as to any material fact and the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is not a "disfavored legal shortcut[;]" rather, it is a reasoned and careful way to resolve cases fairly and expeditiously. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether a genuine issue of material fact exists, the court must view all facts and reasonable inferences in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Tao v. Freeh,* 27 F.3d 635, 638 (D.C.Cir.1994). To be "material" and "genuine," a factual dispute must be capable of affecting the substantive outcome of the case. *See Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505; *Laningham v. United States Navy,* 813 F.2d 1236, 1242–43 (D.C.Cir.1987).

## B. Count One

■ The first count in the complaint challenges the DOE's allocation under the MSRP of recovered crude oil overcharges between the reserve for private-party claimants (20%) and the public fund earmarked for the States and the federal government (80%). Plaintiffs argue that the 20% limitation was an erroneous estimate of the monies necessary to implement the "volumetric method," which they believe is the true restitutionary formula adopted by the DOE. The DOE, in contrast, contends that Count One is barred by earlier court decisions holding that Plaintiffs may not bring a claim contesting the alleged inadequacy of the 20% reserve funds.

As the DOE points out, several prior cases are indeed relevant to the Court's disposition of Count One; Plaintiffs have litigated this issue several times before. In 1990, Judge Harold H. Greene of this Court dismissed a lawsuit by Plaintiffs challenging the 20% limitation. *See Consol. Edison Co. v. Herrington ("Con Ed I"),* 752 F.Supp. 1082 (D.D.C.1990), *aff'd, Consol. Edison Co. v. Watkins,* 927 F.2d 1227 (TECA 1991). There, Plaintiffs sought to prevent future distributions from the 80% fund to the States and the federal government, at least until it could be determined how much of the total recovered overcharges would be necessary to provide the private-party claimants with full restitution. Judge Greene found that this claim was not ripe because there was nothing more than the "mere potential for future injury." *Id.* at 1085.

Plaintiffs again challenged the 20% limitation on the reserve for private-party claimants in 1996 and were dismissed by this Court for lack of standing. *See Consol. Edison Co. v. O'Leary ("Con Ed II"),* 4 Energy Mgmt. (CCH) ¶ 26,698 (D.D.C. 1996), *aff'd,* 117 F.3d 538, 544 (Fed.Cir. 1997). The Federal Circuit affirmed on the basis that the ESA did not authorize "a private cause of action on which relief could be granted with regard to the overall allocation of funds recovered under § 209, the public enforcement section." *Consol. Edison Co. v. Richardson ("Con Ed III"),* 233 F.3d 1376, 1380 (Fed.Cir.2000) (de-

scribing the Federal Circuit's holding in *Con Ed II* ). Private suits are permitted under § 210 of the ESA, but only against other private parties, not the government. *See Con Ed II,* 117 F.3d at 544.

Plaintiffs correctly note that Judge Greene dismissed their 1990 challenge to the 20% limitation in *Con Ed I* because the issue was not ripe for determination, not because they lacked standing. In 1996, however, Judge Greene did dismiss for lack of standing when Plaintiffs sought to eliminate the 20% limitation in another lawsuit. *See Con Ed II,* 4 Energy Mgmt. (CCH) ¶ 26,698 (noting a "long line of cases . . . holding that a claimant to a DOE escrow has no standing to challenge DOE's distribution of funds to third parties"). On appeal, the Federal Circuit agreed with the result, but changed the rationale. The Court of Appeals held that Plaintiffs did not state a claim upon which relief could be granted because "private claimants have no express or implied cause of action under Section 209 of the ESA or under the PODRA." *Con Ed II,* 117 F.3d at 545.

Plaintiffs argue that the Federal Circuit's subsequent decision in *Con Ed III* effectively reversed *Con Ed II* on these issues when it recognized that Plaintiffs did have standing to challenge a distribution to a fellow private-party claimant from the 20% reserve funds. In *Con Ed III,* Plaintiffs had appealed the DOE's distribution from those funds of nearly $1 million on the grounds that the award was excessive and not supported by the evidence. The Federal Circuit held that Plaintiffs had standing to make such an allegation and that they had properly stated a claim. *See Con Ed III,* 233 F.3d at 1381 (Fed.Cir. 2000). It distinguished—but did not overrule—*Con Ed II* by limiting that case to challenges to "a discretionary matter of broad public policy or . . . otherwise par-

ticularly committed to the discretion of the agency."

Under *Con Ed II,* the Court finds that the 80%–20% allocation of recovered crude oil overcharges is discretionary to the DOE. *See Con Ed III,* 233 F.3d at 1381 (In *Con Ed II,* "the issue was the allocation, between the individual claimants and the government claimants, of recovered overcharges, both generally and under the particular settlement involved. [That] case[ ] involved [a] discretionary decision[ ] by the DOE with regard to how to implement the statutory requirement that producers who overcharged customers be required to make recompense."). Therefore, even assuming that Plaintiffs have standing under *Con Ed III* to challenge this allocation, the DOE may not be sued under these circumstances. *Con Ed II* expressly held that the DOE's determination to allocate recovered overcharges on an 80%–20% basis implicated policy considerations and that courts "should not interfere with the agency's actions in implementing broad policies." *Id.* at 1382. *Con Ed III* did nothing to disturb the viability of *Con Ed II* with respect to the discretionary nature of the DOE's 80%–20% allocation of crude oil overcharges. At most, the Federal Circuit's decision in *Con Ed III* merely supports Plaintiffs' assertion that they have standing to bring Count One. Since Plaintiffs must also state a cognizable claim to prevail, *Con Ed III* does not provide a sufficient basis for this challenge.

Plaintiffs counter that the true DOE policy is a restitutionary formula, not the 80%–20% split, and that *Con Ed II* was based on an historical mistake of fact. They argue that the "volumetric method" is really the discretionary matter of broad public policy entitled to protection from challenge and that the Federal Circuit erred in *Con Ed II* when it found otherwise. *See* Pls. Reply at 13. Granting

Plaintiffs all of the inferences to which they are entitled in responding to a motion for summary judgment, the Court notes that the origin of the allocation percentages—*i.e.,* whether they were based on an incorrect prediction of how the refund process would play out—has become immaterial. The *selection* of those percentages back in 1986 was a "best guess" at that time, to which everyone agreed. The fact that the DOE, and everyone else, apparently guessed wrong does not change the nature of the initial determination as an exercise of discretion. For this reason—and based on the Federal Circuit's previous ruling on this issue in *Con Ed II*—the Court holds that the 20% limitation was a policy decision not subject to attack.

## C. Count Two

■ In Count Two of the complaint, Plaintiffs seek the final distribution of the recovered crude oil overcharges in the 20% reserve funds. They contend that the DOE has an enforceable duty to complete the disbursement of all monies in those funds. Citing the standard set forth in *Cobell v. Babbitt,* 30 F.Supp.2d 24, 35 (D.D.C.1998), they state that this duty is "clear and undisputable" based on (1) the settlement of the *Stripper Well* litigation, including promises made by the DOE in obtaining its approval, (2) the DOE's promulgation of a policy and formula for individual restitution, which was approved by the courts, and (3) congressional support for the policy of individual restitution, as embodied in the PODRA. Pls. Opp. at 42. Plaintiffs do not ask for the immediate issuance of a writ of mandamus; rather, they ask for a judicial declaration that (1) there is an enforceable duty to make a final distribution of at least a portion of the $262 million designated for restitution to private-party claimants, and (2) no further delay in beginning the process of final distribution is justified.

The DOE argues that a final distribution is inappropriate at this time because the OHA still has twenty-five cases pending and various administrative matters to handle following their resolution. The "OHA has advised plaintiffs that it will not be in a position to determine *whether* any further direct payments to plaintiffs is warranted until all remaining refund claims are processed." Def. Reply at 2 (emphasis added). Plaintiffs respond that "the claims remaining to be processed represent less than 1% of the volume already approved." Pls. Opp. at 45.

The Court finds that Plaintiffs—and the potential class of other successful claimants to restitution—are entitled to the complete distribution of the 20% reserve funds that the DOE created to provide for restitution to private parties. Since at least 1986, the MSRP established by the DOE has set forth the standard that 20% of the recovered overcharges would be distributed to successful private-party claimants (*i.e.,* individual victims of price gouging in violation of the price control regulations). *See* MSRP, 51 Fed.Reg. 27,899 (Aug. 4, 1986). The DOE cannot now suddenly change that commitment and the implementing regulations unless and until the 20% reserve proves to be more money than needed, which is clearly not the case. Thus, whether and how much the DOE uses those funds for restitution to private parties or for governmental purposes has already been determined by the DOE contrary to its current position. Unless all private-party claimants have received full restitution under the "volumetric method," the funds are held by the DOE for that purpose and no other. The sole limitation would be if the "final" amount of monies were too small to warrant the calculation and distribution of it to such successful claimants as have not previously received complete refunds. Inasmuch as the current value of the 20% funds is well over

$250 million, that end point has clearly not yet been reached.

Although Plaintiffs possess a right to the distribution of the remaining funds in the 20% reserve, the Court concludes that—on this record—it is unable either to issue a writ of mandamus ordering the DOE to complete distribution of those funds or to declare that further delay in making the final distribution is unjustified. Plaintiffs do not point the Court to any statute or regulation imposing a time restriction on the DOE. They ground this claim in the argument that "[n]o further delay will provide any more certainty as to the appropriate amount to be distributed." Pls. Opp. at 45. While this may be true, it is not enough to warrant judicial intervention at this time into the DOE's crude oil overcharge refund process.[7]

### D. Count Three

■ Count Three of the complaint requests the inclusion of monies recovered from the Marc Rich Companies in the 20% reserve funds, together with interest that would have been earned since the 1984 recovery. Plaintiffs claim that § 209 of the ESA required the DOE to use $100 million of the $150 million settlement for restitution. They argue that the DOE's failure to lay claim to and then allocate $100 million to the crude oil overcharge funds constituted "an abuse of discretion." Pls. Opp. at 56.

In its motion for summary judgment, the DOE remarks that Plaintiffs already made this allegation in *Con Ed I*, which was dismissed by Judge Greene on standing grounds and affirmed by the TECA. *See* DOE Mot. Ex. A. Therefore, it concludes, Plaintiffs are barred from re-litigating the issue here. Plaintiffs respond that "the barrier recognized by the [*Con Ed I* ] Court to preclude a determination on the merits as to the claim of plaintiffs and their fellow claimants to a portion of refunds obtained from the Marc Rich Companies has been eliminated [by *Con Ed III* ]." Pls. Reply at 20.

Presuming all facts in Plaintiffs' favor on this point, and noting the DOE's strong disagreement, the Court finds that some of the monies received by the Department of the Treasury from the settlement with the Marc Rich Companies were "restitution" funds within the meaning of § 209 of the ESA. Nonetheless, the holding in *Con Ed III* that Plaintiffs may appeal a refund distribution to another private party does not give rise to standing or a cause of action to challenge a decision by the federal government to apply all of the monies from the Marc Rich Companies criminal prosecution elsewhere. In *Con Ed III,* the Federal Circuit held that Plaintiffs had standing to challenge a distribution from their 20% funds because "an award to any claimant automatically decreases the funds available to all other claimants[.]" *Con Ed III,* 233 F.3d at 1383 (Fed.Cir.2000). The Court of Appeals explained that "[e]rrors attributing an excessive consumption volume to a particular claimant adversely impact the volumetric, and thus come at the expense of all the other claimants." *Id.* The monies from the Marc Rich Companies settlement, however, did not make it to the reserve for private-party claimants. Consequently, those funds were never subject to the exactitudes of the "volumetric method" that allowed the *Con Ed III* Court to determine Plaintiffs' injury from the DOE's action regarding a third party.

Moreover, exactly who made the decision concerning the allocation of the settlement funds—the United States Attorney's

---

7. The Court anticipates that it will not take long for the DOE to decide the paltry remaining claims.

office that prosecuted, the Treasury Department that received the payments, or the DOE that decided not to claim its share—is not even known. That open-ended question demonstrates just how much the decision of how to allocate the Marc Rich Companies settlement funds reflected a discretionary judgment by government officials on a broad policy issue that may not be second-guessed by the Court.

### III.   CONCLUSION

For these reasons, both the DOE's motion for summary judgment and Plaintiffs' motion for partial summary judgment are granted in part and denied in part. Counts One and Three of the complaint are dismissed because they involve discretionary matters not subject to judicial review. With respect to Count Two, the Court declares that Plaintiffs and other successful private-party claimants are entitled to a distribution of the entire 20% reserve, insofar as practicable. On this record, the Court is unable to order the DOE to distribute those monies at this time. A separate order accompanies this memorandum opinion.

### *ORDER*

For the reasons set forth in the memorandum opinion that accompanies this order, it is hereby

**ORDERED** that Plaintiffs' motion for partial summary judgment is **GRANTED** in part and **DENIED** in part. With respect to Count Two of the complaint, the Court declares that Plaintiffs and other successful private-party claimants are entitled to a distribution of the entire 20% reserve described in the Modified Statement of Restitutionary Policy for Crude Oil Cases, 51 Fed.Reg. 27,899 (Aug. 4, 1986), insofar as practicable and unless they have received a full refund under the "volumetric method." It is

**FURTHER ORDERED** that Defendants' motion to dismiss or, in the alternative, for summary judgment is **GRANTED** in part and **DENIED** in part. Counts One and Three of the complaint are **DISMISSED.** It is

**FURTHER ORDERED** that this order constitutes a **FINAL JUDGMENT** in this case.

**SO ORDERED.**